UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

LAVONDA JOHNSON et al.,                                                         Plaintiffs,

v.                                                   Civil Action No. 1:17-cv-175-DJH-HBB

THE BOARD OF EDUCATION OF THE
BOWLING GREEN INDEPENDENT
SCHOOL DISTRICT and GARY FIELDS *in
his official capacity*,                                      Defendants.

\* \* \* \* \*

**MEMORANDUM OPINON AND ORDER**

Plaintiffs coached the girls' basketball team at Bowling Green High School. (Docket No. 49-1, PageID # 1501–02)  Greg Johnson and Jalyn Savage were terminated as assistant coaches following the 2015–2016 basketball season, and LaVonda Johnson was terminated as head coach after the 2016–17 season.  (D.N. 54, PageID # 1654)  All three plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission and received right-to-sue letters.  (D.N. 49-1, PageID # 1532)  Plaintiffs then brought this action alleging racial discrimination under Title VII and the Kentucky Civil Rights Act and retaliation in violation of Title VII, the KCRA, the Kentucky Whistleblower Act, and Title IX.  (D.N. 1-1, PageID # 13)  Defendants move for summary judgment on all of Plaintiffs' claims.  (D.N. 49)  The matter was reassigned to the undersigned on September 3, 2020 (D.N. 58), and the Court held oral argument on Defendants' motion on January 7, 2021.  (D.N. 66)  For the reasons set forth below, the Court will grant Defendants' motion as to Gary Fields and the retaliation claims but will deny the motion with respect to Plaintiffs' racial-discrimination claims under Title VII and the KCRA.

1

## I.

As the principal of Bowling Green High School (BGHS), Gary Fields recruited LaVonda Johnson to be the head coach of the girls' basketball team and a teacher at the school beginning with the 2007–08 school year. (D.N. 54, PageID # 1654–55) Fields allowed LaVonda Johnson to select her assistant coaches, and she selected her brother Greg Johnson and Kim Calhoun. (*Id.*, PageID # 1655) LaVonda Johnson discussed potential nepotism concerns with Fields, and he supported her hiring decisions. (*Id.*) In 2012, Jalyn Savage joined the team as a volunteer bookkeeper. (D.N. 49-1, PageID # 1501) Before the 2014–15 season, Jalyn Savage began receiving a stipend of five-hundred dollars, but she was never formally hired as an assistant coach. (*Id.*, PageID # 1501–02) LaVonda Johnson, Greg Johnson, and Jalyn Savage are all African American. During LaVonda Johnson's tenure as the head coach, the girls' varsity team sported a 233-47 record with four regional championship titles. (D.N. 54, PageID # 1655)

**A.     2015–16 Basketball Season**

Before the beginning of the 2015–16 school year, Fields became the superintendent of the Bowling Green Independent School District, and Will King was named the principal of BGHS. (D.N. 49-1, PageID # 1502) The girls' basketball team had a number of issues during the 2015–16 basketball season that culminated in a meeting on March 24, 2016, where school administrators decided to terminate Greg Johnson and Jalyn Savage and to place LaVonda Johnson on a performance-expectations plan.[1] (*Id.*, PageID # 1519) In October 2015, LaVonda Johnson had an

---

[1] Defendants also bring up several issues that occurred in the years prior to the 2015–16 basketball season that were each discussed with the coaches at the time but were not raised as issues with the coaches again. (D.N. 49-1, PageID # 1510–14) Defendants make no assertion that any of these perceived issues led to the March 24, 2016 meeting (*see id.*, PageID # 1514–19), and Defendants therefore have not shown how these alleged issues are related to the employment decisions at the center of this case.

altercation with one of her players where she used profanity to tell the player to leave practice. (D.N. 54, PageID # 1656) LaVonda Johnson admitted her error and received a private reprimand from Superintendent Fields concerning the incident. (*Id.*)

Later that month, Fields claims that assistant coach Calhoun approached him about resigning because she "was on the outside looking in" and this concerned Fields because, as the former principal of BGHS, he had known Calhoun to be the "go-to person" for the players. (D.N. 49-1, PageID # 1503) After Calhoun gave birth to her first child, LaVonda Johnson had expressed frustration to Calhoun that she was often late to practice or games. (D.N. 54, PageID # 1657) Neither Fields nor Calhoun ever discussed any of these concerns with LaVonda Johnson. (*Id.*) Calhoun resigned following the 2015–16 basketball season. (D.N. 49-1, PageID # 1508)

Another problem arose in November 2015 when a parent sent a letter to Principal King alleging violations of Title IX for failure to evenly distribute funds to the girls' and boys' basketball teams. (*Id.*, PageID # 1504) LaVonda Johnson acknowledged that she did not always use all the allotted funds for the girls' program. (*Id.*) King held a meeting with the District's Title IX coordinator, booster-club parents, and LaVonda Johnson to address the concerns about the allotment of funds. (*Id.*, PageID # 1504–05) The Title IX Coordinator issued a report concluding that both teams were receiving equal funding (*id.*, PageID # 1505) and that no Title IX violation had occurred. (D.N. 54, PageID # 1657)

Over the 2015 winter break, the BGHS boys' basketball team hosted a tournament, and Defendants allege that Greg Johnson searched a participating player's bag for a missing warm-up shirt. (D.N. 54, PageID # 1505) King contacted LaVonda Johnson and informed her that only a school administrator could search a player's bag. (*Id.*) According to Plaintiffs, Greg Johnson

3

denies ever searching a player's bag and asserts that "Barren County's coach searched his own player's bag." (D.N. 54, PageID # 1657)

In January 2016, Principal King learned of another instance of LaVonda Johnson and Greg Johnson using profanity after a loss. (D.N. 49-1, PageID # 1505) Plaintiffs contend that, even assuming that this allegation is true, Superintendent Fields has recognized that use of profanity was common in high school sports, and he stated that he would not regularly address such profanity unless a parent complained. (D.N. 54, PageID # 1657–58; D.N. 43, PageID # 1178) Defendants make no contention that anyone confronted or reprimanded any of the coaches concerning the incident. (*See* D.N. 49-1, PageID # 1505–06)

Prior to the start of the girls' district basketball tournament, Jalyn Savage posted a tweet, which Principal King was concerned would prejudice the team in the upcoming tournament. (*Id.*, PageID # 1506) According to Plaintiffs, however, Savage asked King if he wanted her to delete the tweet, and King said it was not necessary and never discussed the matter with the coaches again. (D.N. 54, PageID # 1658)

In February 2016, BGHS hosted the girls' district basketball tournament. (D.N. 49-1, PageID # 1506) BGHS lost in the championship game, and during the award ceremony, one of BGHS's players allegedly threatened a player from the other team. (*Id.*) Principal King stated that he told LaVonda Johnson to suspend the player for the following game, but that at the next game, a parent expressed frustration that LaVonda Johnson had informed her of the suspension only a few hours before the game. (*Id.*, PageID # 1506–07)

Following the award ceremony, LaVonda Johnson admitted that she threw the runner-up trophy when she was alone in the locker room, and she admitted that she failed to represent the team at the drawing for the regional tournament, which "was embarrassing to [Defendants]." (*Id.*,

4

PageID # 1507)  Instead, the assistant athletic director had to attend the regional-tournament drawing in LaVonda Johnson's place.  (*Id.*)  LaVonda Johnson asserts that she spoke with the assistant athletic director before the game and confirmed that he could attend the drawing if needed.  (D.N. 54, PageID # 1658)

**B.     March 24, 2016 Meeting**

After the 2015–16 basketball season, Principal King contacted Superintendent Fields and requested a meeting to address issues relating to the girls' basketball team that had come up throughout the season.[2]  (D.N. 49-1, PageID # 1509)  The "overriding concern" that led to the March 24, 2016 meeting was a perceived decline in the girls' basketball program because of a lower number of players on the team.  (*Id.*, PageID # 1514)  When LaVonda Johnson took over the program, Defendants assert that there were as many as twenty-five players in the program and, by the end of the 2017 season, there were thirteen players remaining on the team who were not graduating.  (*Id.*, PageID # 1508–09)  In Defendants' view, the girls' program "was dying on the vine literally [sic]."  (*Id.*, PageID # 1515)

Principal King's March 24, 2016 meeting minutes listed discussion regarding "[n]o diversity on the team (E.S., A.P.[3])," "[n]ot retaining middle school players in the transition," and "[w]e need our bench to reflect what BGHS looks like."  (*Id.*)  Defendants contend that this discussion was about attempting to recruit as many players as possible and that diversity meant "more players from a range of different backgrounds," specifically multi-sport athletes.  (*Id.*, PageID # 1516).  But Plaintiffs say that the only specific reference to diversity in the meeting

---

[2] In addition to Principal King and Superintendent Fields, D.G. Sherill (BGHS Athletic Director), Kevin Wallace (Assistant BGHS Athletic Director and BGHS head-football coach), and Ken May (District Personnel Director) were also present at the meeting.  (D.N. 49-1, PageID # 1509)
[3] In his deposition, Fields confirmed that E.S. and A.P. are the initials of two girls who were the only white players on the team at the time.  (D.N. 43, PageID # 1193)

minutes is regarding racial diversity. (D.N. 54, PageID # 1677) At the meeting, the administrators developed several "action items" intended to improve the player experience such as increasing the number of practices, games, and tournaments. (D.N. 49-1, PageID # 1517–18) These actions were the same as a list of directives then-Principal Fields gave LaVonda Johnson in 2012 that she had not accomplished. (*Id.*, PageID # 1518)

The administrators also discussed whether to keep all the coaches, remove some of the coaches, or remove all the coaches. (*Id.*) Superintendent Fields explained that removing all three coaches was not really an option because "the public" would not be willing to accept removal of all the coaches in light of the girls' basketball program's winning record. (D.N. 43, PageID # 1192) The administrators ultimately decided to remove assistant coaches Greg Johnson and Jalyn Savage, and to retain head coach LaVonda Johnson. (D.N. 49-1, PageID # 1518–19) When it came to hiring replacement coaches, the administrators discussed a desire to have more coaches that were high-school employees because, they believed, this could help recruit more players to the team. (*Id.*, PageID # 1517) As part of this discussion, the administrators considered four BGHS employees as potential replacement coaches: three were white and one was African American. (*Id.*, PageID # 1519–20)

Since LaVonda Johnson was staying as head coach, the administrators concluded that she needed to be put on a performance-expectations plan. (*Id.*, PageID # 1519) The first draft of the plan separately listed requirements for LaVonda Johnson to "[w]ork to increase the number of girls participating in the program" and "[w]ork to increase the diversity of players participating in our program so that they more accurately reflect the diversity of Bowling Green High School." (D.N. 54, PageID # 1660) The final draft of the plan combined these points to direct LaVonda Johnson to "work to encourage and increase the participation of any and all students to try out for

our basketball team." (D.N. 49-1, PageID # 1520) The performance-expectations plan also included replacing both Greg Johnson and Savage as assistant coaches. (*Id.*, PageID # 1521) Principal King met with LaVonda Johnson on March 31, 2016 to present the plan. She asked if she could consider the plan before they discussed it further. (D.N. 54, PageID # 1661)

**C.     April 1, 2016 Meeting**

On April 1, 2016, Principal King met with LaVonda Johnson, Greg Johnson, Jalyn Savage, and Marshall Gray (a parent of one of the players) to discuss the removal of Greg Johnson and Savage as coaches. (*Id.*) King explained that, after Calhoun's resignation, this was "an opportunity to take the program in a new direction with fresh faces" and that the administrators wanted "in-house staff" to help build relationships with players during the school day. (D.N. 49-1, PageID # 1521–22)

Plaintiffs assert that in response to questions about the rationale for the employment decisions made on March 24, 2016, King stated that the administrators "wanted the bench to reflect the diversity of BGHS." (D.N. 54, PageID # 1661) According to Plaintiffs, Gray asked whether this meant that the administrators wanted more white players on the team, and King said yes. (*Id.*) Gray then asked if this meant that the administrators wanted more white coaches and, King again said yes. (*Id.*) In his deposition, King acknowledged that Gray "may have asked, you know, what do you mean by diversity on the bench" and that King "may have followed-up with . . . you know, diversity, like reflective of our school diversity." (D.N. 42, PageID # 927) King stated that he didn't "recall [Gray] asking any clarification outside of, what do you mean by diversity." (*Id.*) King did not deny that Gray asked the specific questions, but instead he stated that he did not "recall th[ose] question[s] ever being asked." (*Id.*) Principal King's irresolute responses fail to

7

support Defendants' contention that no genuine dispute of fact exists concerning the motive behind the employment decisions.

**D.     2016–17 Basketball Season**

Following the April 1, 2016 meeting, LaVonda Johnson met with Superintendent Fields twice, and he reiterated that the decision to terminate the Greg Johnson and Savage was final. (D.N. 54, PageID # 1661–62)  Principal King then led the search for new assistant coaches, which was unlike previous assistant-coach searches where LaVonda Johnson was allowed to select her coaches.  (*Id.*, PageID # 1662)  Plaintiffs contend that LaVonda Johnson participated in the interviews but indicated that she did not have a preference in the candidates King selected and that she would work with anyone King hired.  (*Id.*)  In contrast, Defendants assert that LaVonda Johnson refused to participate in the hiring process and that King ultimately informed LaVonda Johnson she had been insubordinate. (D.N. 49-1, PageID # 1527)  King selected three new coaches that were all African American, but, only one worked at BGHS at the time of hiring, and two worked at BGHS by the beginning of the 2016–17 basketball season.  (D.N. 54, PageID # 1662)

At the beginning of the basketball season, LaVonda Johnson sent a letter to Principal King to ask if she was meeting his expectations, but King did not immediately respond.  (*Id.*, PageID # 1663)  Then, in December 2016, one of the new assistant coaches was arrested and charged with sexual abuse of a student at school.  (*Id.*)  In January 2017, the other two new coaches contacted the administration at BGHS to say that they were considering resigning.  (D.N. 49-1, PageID # 1528)  Defendants allege that the assistant coaches had to take on extra work because LaVonda Johnson was shirking responsibilities.  (*Id.*)  King responded to LaVonda Johnson's letter in January and indicated that he believed that she was not satisfying the performance expectations though he did not bring up the concerns raised by the assistant coaches.  (*Id.*, PageID # 1528–29)

8

In May 2017, Principal King informed LaVonda Johnson that, because she had not completed the objectives of the performance-expectations plan, she would remain on the plan for another year. (*Id.*, PageID # 1529–30) In June 2017, King investigated an allegation that LaVonda Johnson had discussed a player's medication in front of other members of the team. (*Id.*, PageID # 1530–31) LaVonda Johnson thought that no one could hear her when she made the comment (D.N. 54, PageID # 1664), but some people reported that they heard what LaVonda Johnson said to the player. (*Id.*)

On July 16, 2017, King recommended to Superintendent Fields that LaVonda Johnson be terminated from her position as head coach. (D.N. 49-1, PageID # 1531) Fields decided to accept the recommendation of King and notified LaVonda Johnson of her termination on August 3, 2017. (*Id.*)

## II.

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, the Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)–(3). To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of its claims. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322–23 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

### A. Racial Discrimination

Title VII prohibits an employer from discriminating "against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[A] plaintiff can establish a *prima facie* case [of unlawful discrimination] by presenting direct evidence of discriminatory intent." *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). To establish a Title VII claim, Plaintiffs must also demonstrate that they suffered an adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (citation omitted). Courts interpret Title VII and the Kentucky Civil Rights Act using the same standards. *Perry v. AutoZoners, LLC*, 948 F. Supp. 2d 778, 787 (W.D. Ky. 2013) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000)).

#### 1. Adverse Employment Action

While Defendants concede that Greg Johnson and Jalyn Savage suffered adverse employment actions in the form of termination (D.N. 56, PageID # 1703), they argue that placing LaVonda Johnson on a performance-expectations plan is not an adverse employment action. (*Id.*) Both parties acknowledge that being placed on a performance-expectations plan alone is insufficient to constitute an adverse employment action. (D.N. 54, PageID # 1672; D.N. 56, PageID # 1703) *see White*, 533 F.3d at 402 (noting that "[i]n general, 'a negative performance evaluation does not constitute an adverse employment action'" (quoting *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007))). But a performance-expectations plan may

10

constitute an adverse action if the plaintiff shows a tangible employment action that the plaintiff "suffered, or is in jeopardy of suffering," because of the performance-expectations plan. *White*, 533 F.3d at 402 (quoting *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 789 (6th Cir. 2000)). This Court has previously concluded that a performance-expectations plan that eventually results in termination is sufficient to constitute an adverse employment action. *Keys v. Humana, Inc.*, No. 3:09-cv-834-CRS, 2010 WL 2961186, at *3 (W.D. Ky. July 26, 2010) *rev'd on other grounds*, 684 F.3d 605 (6th Cir. 2012).

When discussing the possible removal of LaVonda Johnson during the March 24, 2016 meeting, Superintendent Fields explained that removing all the coaches at the same time would be unacceptable to "the public" because of the program's winning record. (D.N. 43, PageID # 1192) As a result, the administrators retained LaVonda Johnson but placed her on a performance-expectations plan. (D.N. 54, PageID # 1661) Sixteen months later, Fields notified LaVonda Johnson of her termination. (D.N. 49-1, PageID # 1531) In Principal King's memorandum to Fields recommending that he terminate LaVonda Johnson as a coach, King twice referred to the performance-expectations plan and listed the failure to follow the plan as one of the rationales for terminating her. (D.N. 49-21, PageID # 1639–40) Under these circumstances, the Court concludes that LaVonda Johnson has presented sufficient evidence to allow a reasonable jury to conclude that she was terminated because of her placement on the performance-expectations plan. The performance-expectations plan therefore constitutes an adverse employment action for the purposes of the racial-discrimination claim. *See White*, 533 F.3d at 403 (holding that the plaintiff "produced sufficient evidence for a reasonable jury to conclude that he suffered an adverse employment action in the form of [a] downgraded 2004 performance evaluation"); *Keys*, 2010 WL

2961186, at *3 (finding that a performance improvement plan was an adverse employment action because the plaintiff presented evidence that it eventually resulted in the loss of the plaintiff's job).

### 2. Direct Evidence of Discrimination

Plaintiffs argue that King's alleged statements that the administrators wanted more white players and coaches in the April 1, 2016 meeting constitute direct evidence of discrimination against all three plaintiffs. (D.N. 54, PageID # 1668) Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ondricko v. MGM Grand Detroit*, 689 F.3d 642, 650 (6th Cir. 2012) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Direct evidence of discrimination "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated, at least in part" by unlawful discrimination. *Bolden v. Lowes Home Ctrs., LLC*, 783 F. App'x 589, 598 (6th Cir. 2019) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). "[A] facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." *Harris Funeral Homes*, 884 F.3d at 571 (quoting *Nguyen*, 229 F.3d at 563). "In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Ondricko*, 689 F.3d at 650 (quoting *Nguyen*, 229 F.3d at 563).

"To determine if statements are 'relevant' as direct evidence of discrimination or are merely 'stray remarks,' courts generally consider: (1) whether the remarks were made by the decisionmaker or by an agent uninvolved in the challenged decision; (2) whether the remarks were

isolated or part of a pattern of biased comments; (3) whether the remarks were made close in time to the challenged decision; and (4) whether the remarks were ambiguous or clearly reflective of discriminatory bias." *Worthy v. Mich. Bell. Tel. Co.*, 472 F. App'x 342, 347 (6th Cir. 2012) (citations omitted).

Defendants argue that Principal King's alleged statements do not constitute direct evidence of discrimination because they contend that King was not the final decision maker (D.N. 67, PageID # 1733–34) and that the alleged statements were isolated.[4] (*Id.*, PageID # 1740) In Defendants' view, King was not a decisionmaker because Superintendent Fields had the final authority to remove the coaches. (D.N. 67, PageID # 1736) That King did not have the final authority to remove the assistant coaches is not dispositive; "remarks by any official who played a 'meaningful role' in the employment decision or 'may have influenced the decision' may constitute direct evidence of discrimination." *Taylor v. Bd. of Educ. of Memphis City Schs.*, 240 F. App'x 717, 720 (6th Cir. 2007) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998)). Here, King requested the March 24, 2016 meeting (D.N. 49-1, PageID

---

[4] Defendants appear to present the additional argument with respect to LaVonda Johnson that Principal King's statements were not direct evidence of discrimination because the statements were "not related to the decision-making process in regard to" LaVonda Johnson. (D.N. 67, PageID # 1752) In his alleged statements, King referred only to the removal of Greg Johnson and Jalyn Savage. (D.N. 54, PageID # 1661) Superintendent Fields explained in the March 24, 2016 meeting, however, that the decision to remove only two coaches was made in light of the recognition that "the public" would not accept the removal of all three coaches. (D.N. 43, PageID # 1192) Because the administrators decided that LaVonda Johnson would remain as the head coach, they also "concluded that [LaVonda] Johnson should be placed on a performance expectations plan similar to a teacher." (D.N. 49-1, PageID # 1519) As a result, Plaintiffs have presented sufficient evidence for a reasonable jury to conclude that the decisions are tied together, and that the alleged statements, if true, would require no inference for the jury to conclude that the discriminatory motive was at least a motivating factor in placing LaVonda Johnson on a performance-expectations plan. *Bolden*, 783 F. App'x at 598 (citation omitted).

# 1509), and he participated in the discussion that led to the adverse employment actions.[5] (D.N. 67, PageID # 1738–39) As a result, King "played a meaningful role" in the adverse employment actions. *Taylor*, 240 F. App'x at 720.

Defendants next argue that Principal King's alleged statements were isolated because it was only one instance and that Plaintiffs never allege that King or any other administrator made separate discriminatory remarks. (D.N. 67, PageID # 1739–40) King's alleged statements, however, were not offhand remarks; the statements came in direct response to questions about the rationale behind the employment decisions made in the March 24, 2016 meeting. (D.N. 54, PageID # 1661) Defendants concede as much (D.N. 67, PageID # 1740), and the Court therefore finds that King's statements were not isolated comments. *See Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013) (finding that the comments in question were not isolated because they "were offered to explain the very decision at the heart of [the] lawsuit"). Further, King's statements require no inference to conclude that the employment decision was motivated by race; the alleged statements directly affirm that the employment decision was made to get more white coaches on the bench. (D.N. 54, PageID # 1668) *see Bolden*, 783 F. App'x at 598 (citation omitted). King's alleged statements thus are not stray remarks but are relevant as direct evidence of discrimination. *Worthy*, 472 F. App'x at 347.

Even if Principal King's alleged statements constitute direct evidence of discrimination, Defendants argue that summary judgment is appropriate because there is no genuine dispute of fact that Defendants' allegations that the program "was in trouble" justified the adverse employment actions "regardless of any racial motivation." (D.N. 56, PageID # 1702–03; D.N. 67,

---

[5] In fact, in Principal King's deposition, when questioned about "[his] decision to remove Greg and Jalyn," he does not contest the presumption that he was responsible for the employment decision. (D.N. 42, PageID # 925)

14

PageID # 1742) But this opinion regarding the state of the program is disputed. Plaintiffs claim that a number of Defendants' allegations about the program are based upon faulty assumptions. (D.N. 54, PageID # 1657–59) Viewing the evidence in a light most favorable to the plaintiffs at the summary judgment stage, a reasonable jury could discredit Defendants' purported justifications for the adverse employment actions.[6] *Loyd*, 766 F.3d at 588 (citation omitted).

Summary judgment would not be appropriate even if Defendants had undisputedly established the allegations and concerns about the growth of the program. In light of the proffered direct evidence of discrimination, a reasonable jury could disbelieve Defendants' contentions that the decision would have been made absent such discriminatory motives; at most, Defendants' allegations create a genuine dispute of fact about the motives behind the adverse employment actions. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010) ("Inquiries into what motivated an employer's decision 'are very fact sensitive' and 'will generally be difficult to determine at the summary judgment stage.'" (citation omitted)); *see also Yadian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 649 (6th Cir. 2015) (finding that when "there are two reasonable interpretation of the evidence," courts must allow a jury to decide whether the employer terminated the employee for a discriminatory or a non-discriminatory reason); *Ondricko*, 689 F.3d at 651 (finding disputed material facts existed when the plaintiff presented direct evidence of

---

[6] For example, Defendants assert that the "overriding concern" was the decline in the number of players in the program and point to the fact that there were only thirteen returning players for the 2017–18 season. (D.N. 49-1, PageID # 1509, 1514) These contentions, however, fail to account for the fact that LaVonda Johnson had always fielded three girls' basketball teams (D.N. 54-1, PageID # 1686), that not every girls' basketball program consistently fielded three teams (*id.*), or that Defendants cite the number returning of players before the team held tryouts. (D.N. 49-1, PageID # 1509) Such conflicting presentations of the evidence present material questions of fact to be resolved by a jury. *Loyd*, 766 F.3d at 588.

discrimination and the defendant presented conflicting justification for removal). As a result, summary judgment is not appropriate for Plaintiffs' racial-discrimination claims.[7]

**B.     Retaliation**

LaVonda Johnson also asserts that she was retaliated against in violation of Title VII.[8] (D.N. 54, PageID # 1681) A plaintiff can establish a *prima facie* case of retaliation by showing that: "(1) [s]he engaged in activity protected by Title VII; (2) the exercise of h[er] civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Nguyen*, 229 F.3d at 563 (citation omitted). The KCRA applies the same standard. *Brooks v. Lexington-Fayette Urb. Hous. Auth.*, 132 S.W.3d 790, 802 (Ky. 2004). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying the prima facie case of retaliation."

---

[7] Plaintiffs also refer generally to this potentially being a mixed-motives case. (*See* D.N. 54, PageID # 1666) A plaintiff can establish a mixed-motives claim when the individual shows that the discrimination was a motivating factor in the employment practice. 42 U.S.C. § 2000e-2(m). If a plaintiff makes this showing, an employer can limit its liability "to injunctive and declaratory relief and attorney fees and costs if the employer can establish that it 'would have taken the same action in the absence of the impermissible motivating factor.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 712 (6th Cir. 2006). The Court notes that, even if Principal King's alleged statement was insufficient to constitute direct evidence of discrimination, it would be sufficient circumstantial evidence to create a genuine dispute of material fact about whether discrimination was a motivating factor in the adverse employment actions. *See id.*; *see also White*, 533 F.3d at 400 (noting that the *McDonnell Douglas* analysis is inapplicable to mixed-motive claims and that summary judgment is inappropriate if there is any evidence that could reasonably be construed to support the plaintiff's claim).

[8] To the extent LaVonda Johnson argues that a retaliation claim under the Kentucky Whistleblower Act and Title IX applies a different standard than a retaliation claim under Title VII, she has waived that claim by failing to defend it in her response opposing summary judgment. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases) ("[The Sixth Circuit's] jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (citing *Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001)); *see also Nguyen*, 229 F.3d at 566–67 ("[C]ases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months.").

Here the parties dispute whether LaVonda Johnson requesting her right-to-sue letter, as opposed to the letter being issued in the normal course of business, constitutes a protected activity. (D.N. 67, PageID # 1745–46) The Court need not resolve this dispute, however, because even if requesting a right-to-sue letter constitutes protected activity, LaVonda Johnson concedes that there is no information in the record to suggest that Superintendent Fields or Principal King was aware that Johnson had requested the right-to-sue letter. (*Id.*, PageID # 1747) As a result, LaVonda Johnson has failed to establish an exercise of her rights protected under Title VII that was both known to Defendants and occurred within sixth months of her termination. *McQueen v. Barr*, 782 F. App'x 459, 465 (6th Cir. 2019) (finding that plaintiff failed to establish a *prima facie* case of retaliation when he provided no evidence the defendant knew of the of the protected activity); *Bruce v. Meharry Medical College*, 692 F. App'x 275, 279 (6th Cir. 2017) (same). The Court therefore concludes she has failed to establish a *prima facie* case of retaliation. *Nguyen*, 229 F.3d at 563 (citation omitted).

### C.  Claims against Fields

Defendants request dismissal of Superintendent Fields in his official capacity (D.N. 49-1, PageID # 1547–48) Because Fields is the superintendent of the Bowling Green Independent School District, a claim against him in his official capacity represents an action against the Board

17

of Education Bowling Green Independent School District.[9] *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) ("Official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." (citation omitted). Since the Board of Education of Bowling Green Independent Schools is a named defendant in this case, the Court will dismiss all claims against Fields in his official capacity.

### III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1) Defendants' motion for summary judgment (D.N. 49) is **GRANTED in part.** LaVonda Johnson's retaliation claims under Title VII, Title IX, the KCRA, and the KWA are **DISMISSED**.

(2) The Clerk of Court is **DIRECTED** to terminate Gary Fields as a defendant in the record of this matter.

(3) The remainder of Defendants' motion for summary judgment (D.N. 49) is **DENIED**.

(4) Consistent with the previous order (D.N. 6), this matter is referred to Magistrate Judge H. Brent Brennenstuhl for a status conference to set a final pre-trial and trial schedule for the remaining claims.

May 7, 2021

David J. Hale, Judge
United States District Court

---

[9] Plaintiffs argue that Superintendent Fields is necessary for any potential equitable relief but make no showing that such equitable relief could not be obtained against the Board of Education of the Bowling Green Independent School District. (D.N. 54, PageID # 1683)